UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
CRISTINA NEWMAN                )
                              )
            Plaintiff,         )
                              )
v.                            )        CIVIL ACTION
                              )        NO. 19-11420-WGY
                              )
ANDREW SAUL,                   )
Commissioner of the Social     )
Security Administration,       )
                              )
            Defendant.         )
_____)
```

Young, D.J.                                      July 17, 2020

## MEMORANDUM & ORDER

### I.   Introduction

Cristina Newman ("Newman") moves to reverse or remand the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her Supplemental Security Income benefits under Title XVI of the Social Security Act("SSI" or "SSI benefits").  The Commissioner cross-moves to affirm the decision.

Newman is correct that the hearing officer's analysis of her fibromyalgia symptoms was not well-supported under the law. Specifically, his decision to give partial weight to her treating physicians warrants remand for a proper evaluation. The hearing officer ruled appropriately on all other issues.

This Court therefore ALLOWS Newman's motion on that basis and DENIES the Commissioner's cross-motion for affirmance.

### A.   Procedural History

On June 27, 2019, Newman filed a complaint in this Court challenging the Commissioner's denial of her SSI application. See Compl., ECF No. 1.  Newman's protected filing date for her SSI application and the alleged date of onset of her disability is June 20, 2016.  Id. ¶¶ 1, 6.  Newman's initial application was denied on December 14, 2016, and denied after reconsideration on February 28, 2017.  Id. ¶¶ 7-8.  Newman requested a hearing, which was conducted on February 13, 2018. Id. ¶¶ 9-10.  The hearing officer issued an unfavorable decision on August 29, 2018.  Id. ¶ 10.  Newman filed a timely appeal with the Appeals Council, which dismissed her request and adopted the hearing officer's decision on April 30, 2019, rendering the Commissioner's opinion final.  Id. ¶ 11; Administrative Record ("R.") 1.

On November 11, 2019, Newman filed a Motion to Reverse or Remand.  Pl.'s Mot. Reverse Remand Decision Comm'r ("Pl.'s Mot.") 2, ECF No. 14; Mem. Law Supp. Mot. Pl.'s Reverse Remand Decision Comm'r ("Pl.'s Mem."), ECF No. 15.  On December 23, 2019, the Commissioner filed a cross Motion to affirm the decision.  Def.'s Mot. Affirm Decision Comm'r ("Def.'s Mot.") 2, ECF No. 16; Mem. Supp. Def.'s Mot. Order Affirm Decision Comm'r

("Def.'s Mem.") 21, ECF No. 17.  Newman filed a reply memorandum opposing the Commissioner's motion to affirm the Commissioner's decision on January 6, 2020.  Reply Mem. Opp'n Def.'s Mot. Affirm Comm'r Decision ("Pl.'s Reply") 6, ECF No. 18.

The parties came before this Court on May 19, 2020 for a hearing by video conference, at the conclusion of which this Court took the matter under advisement.  See Elec. Clerk's Notes, ECF No. 26.

### B.  Facts Alleged

#### 1.  Newman's Work and Medical History

Newman was 50 years-old on June 20, 2016, the alleged date of onset of her disability, and 53 years-old on the date of her hearing.  Compl. ¶ 1; R. 46.  Newman was born in the Dominican Republic, earned a Bachelor's Degree there, and worked at a bank before immigrating to the United States in 2009.  R. 47-55. Once in the United States, Newman worked as a teacher's assistant from November 2010 through May 2011.  R. 54-56. Newman's tenure in that position was cut short due to a workplace injury; she fell, fracturing her coccyx and exacerbating underlying degenerative disc disease, and soon after worsening the injury when the child she was caring for fell on her.  R. 377, 383-384.  Since then, Newman has worked irregularly for short periods including part-time as a receptionist from November 2014 through August 2015, and as a

server at Dunkin' Donuts for one month in 2016.  Id. at 321,
323.  She left her position at Dunkin' Donuts due to its
physical demands.  Id. at 738, 746.

Newman has the following diagnoses of physical impairments:
degenerative changes to the lumbar spine (as of August 2011), R.
1236, and fibromyalgia (as of January 4, 2017).  R. 907.  Newman
also is diagnosed with various psychiatric impairments including
depression, anxiety disorder and Somatic Symptom Disorder.  R.
907, 926, 1129.  Newman regularly complains of pain in her back,
radiating to her lower body.  See e.g., R. 21-23.  Newman has
reported to her providers that physical and psychiatric
complaints interact with each other: her pain worsens her mental
health impairments and vice versa.  R. 860.

### a.   History of Physical Impairments

On June 9, 2016, just prior to the alleged onset date of
June 20, 2016, Newman saw Dr. Kamdar at Massachusetts General
Hospital ("MGH") for low back and bilateral lower extremity
pain.  R.  554.  She also complained of knee pain, and pain that
radiated down both legs.  R. 555.  Dr. Kamdar noted that "mood
and stress appear to be significant contributing factors."  R.
556.  She returned to MGH due to her pain on August 24, 2016
with the same symptoms.  R. 728.  The doctor reported that she
"crys [sic] (weeps) bemoaning her pain as stealing her life."

**4**

R. 729.  She returned due to the same pain on September 22, 2016.  R. 774.

On January 3, 2017, Newman visited the Emergency Room at MGH for pain.  R. 918.  The treatment team performed an X-ray of her right leg and made no significant findings.  R. 940.  Newman later went to the North Shore Medical Center Emergency Room for pain in her back on February 1, 2017.  R. 1012.  The following day, Newman attended an appointment at the MGH Pain Clinic where she received a fibromyalgia diagnosis.  R. 907.

On February 10, 2017, Newman had an MRI of her Lumbar spine which was significant for findings of "focal disc protrusion at L4-L5 which encroaches upon lateral recesses bilaterally and appears to contact the RIGHT more so than the LEFT L5 nerve root."  R. 1156.  Six days later, Newman attended an appointment at the Spaulding Pain Center during which she noted that her pain worsened with sitting or walking more than 20 minutes at a time and that lifting worsened her pain.  R. 1133.

At her April 18, 2017 appointment at Spaulding for occupational therapy, Newman reported significant difficulties with activities of daily living.  R. 1145.  She avoided drying her hair and had trouble bathing and dressing.  Id.  Newman also noted that she needed support to stand up from the toilet and had difficulty with stairs.  Id.  She also reported that pain interrupted her sleep.  R. 1146.

On September 12, 2017, Newman attended an appointment with Dr. Wilfong, her primary care doctor, where he noted that she was diagnosed with a Somatic Symptom Disorder.  Id. at 1129.  In a letter dated September 25, 2017, Dr. Wilfong reported:

> [a]lthough in the long run I feel it is in Ms. Newman's best interest to return to work as tolerated, after observing her interactions with social services and other medical providers, as well as her attempts to arrange employment in the recent past it is my opinion that she is currently unable to fulfill the duties and responsibilities than even part time employment would entail.

R. 1124.  He explained that her pain conditions "limit exertion or sustained period of standing.  Id. at 1124.  The following day, Dr. Wilfong completed a form assessing Newman's physical capabilities.  R. 1125.  He reported that she could sit up to two hours a day, stand up to two hours a day and walk up to two hours a day.  Id.  He reported that she can lift up to twenty pounds frequently and carry up to twenty pounds occasionally. R. 1125-1126.  He also noted that "participation in the above may worsen underlying pain disability."  R. 1126

On October 23, 2017, Newman attended a pain appointment at MGH and inquired about spinal surgery.  R. 1153, 1156.  The doctor indicated "her pain is so diffuse that surgery is unlikely to help her with global pain significantly and I would also worry that her fibromyalgia would put her at risk for post-laminectomy pain syndrome."  R. 1156.

On November 8, 2017, Newman underwent an EMG study which
was normal.  R. 1203, 1205.  On February 7, 2018, Bay State
Physical therapy evaluated Newman and noted difficulties with
activities of daily living.  R. 1197.

### b.  History of Psychiatric Impairments

Newman attended regular appointments with Dr. Kulich, a
psychologist at the MGH Pain Clinic, who treated her from 2013,
R. 1184, through November 2017.  See, e.g., R. 558, 746, 767,
809, 1160, 1184.  In her June and July 2016 appointments, Dr.
Kulich noted that Newman complained of pain and that she did not
have clear major depression symptoms.  R. 558, 746.  Her mental
status exam in June was mostly normal (Dr. Kulich noted that she
was fidgety and had decreased sleep) and the exam in July was
normal.  Id., R. 563.

During the August 8, 2016 appointment, Dr. Kulich again
noted "longstanding pain complaints with her back, legs, and
chronic headaches."  R. 738.  He also wrote that there was "no
clear oversomatization" and "no evidence of malingering."  Id.
Her mental status exam was mostly normal except for a sad,
depressed, frustrated and irritable mood and affect.  R. 742.
Dr. Kulich noted that her symptoms made it difficult for her to
work or take care of things.  R. 744.  He also wrote that her
Patient Health Questionnaire ("PHQ") score reflected moderate
affective symptoms, and diagnosed her with Somatic Symptom

Disorder diagnosis. R. 826. Newman saw Dr. Kulich twice more in August and his notes reflect largely the same findings. R. 790 and 809.

On November 1, 2016, Dr. Kulich reported that Newman remained ruminative with a marked somatic focus and disease conviction. R. 767. He also noted rumination and limited insight on a mental status exam that was otherwise normal. R. 772.

On February 6, 2017, Dr. Kulich completed a psychological assessment indicating that Newman was diagnosed with "Somatic Symptom Disorder" and "SEVERE Fibromyalgia." R. 1184 (capitalization in original). He reported that her prognosis was guarded given a limited and mixed response to care. Id. He also noted that she was ruminative with a marked somatic focus. Id. The form was structured to follow Part B of the Social Security mental health listings, such that the doctor could check the level of impairment he felt the patient had in the general categories including "understanding, remembering or applying information"; "interacting with others"; "concentration, persistence or maintaining pace"; and "adapting or managing oneself." R. 1185-1186; 20 C.F.R. ch. III, Part 404 subpart P, app. 1, § 12.00. Each category included criteria the Social Security Administration used in the listings to define the category. Id.; 20 C.F.R. § 404.1525. Dr. Kulich checked

mostly moderate symptoms in "understanding, remembering or applying information" and "interacting with others." R. 1186. In "concentration, persistence and maintaining pace," Dr. Kulich checked a mixture of marked and extreme limitations. Id. In "adapting or managing oneself," Dr. Kulich checked a mix of moderate and marked, with one extreme. R. 1187. He also noted trouble with activities of daily living and limited insight into impairment. R. 1188-1189. That same day, Dr. Kulich completed a fibromyalgia questionnaire noting significant limitations in Newman's activities of daily living including hygiene and housework. R. 1190.

Dr. Kulich completed a second mental health questionnaire for the Massachusetts Emergency Aid to the Elderly, Disabled, and Children ("EAEDC") program on October 24, 2017. R. 1161. He reported that Newman was diagnosed with a Dysthymic Disorder and a Somatic Symptom Disorder. R. 1162. She had multiple site pain, fibromyalgia and chronic depression. R. 1165. Her symptoms included helplessness, decreased concentration, rumination, restless sleep, marked somatic concerns, and functional impairments. Id. She was also "obsessive regarding somatic symptoms." Id.

### 2. Hearing Testimony and the Hearing Officer's Determination

At the February 13, 2018 hearing, Newman (represented by counsel, Catherine Willard) and vocational expert Elaine Cogliano ("VE") both testified before the hearing officer.  R. 41.  Newman testified that she left her job as a teacher's assistant due to an injury in March 2011 and that she left the job she held from 2014 to 2015 due to pain.  R. 56-57.  She further testified that she had fibromyalgia, chronic lower back pain, depression, and anxiety.  R. 59-67.  Newman managed her pain with a combination of medication,  physical therapy, and lidocaine patches, which afforded her some relief.  R. 60-61. The pain still made activities of daily living, such as laundry, difficult.  R. 61.  Newman testified, "I need to rest twice a day .  .  .  I feeling tired all day."  R. 63.

The hearing officer offered the following hypothetical to determine whether a person with this profile could perform any jobs:

> Now assume if you will that a hypothetical person is
> of the same age, education, language, and work
> background as the claimant.  Further assume that if
> there's work such a person could perform it would be
> subject to the following limitations.  This person
> would be able to lift and carry 20 pounds
> occasionally, 10 pounds on a frequent basis, would be
> able to sit for one-hour at a time for a total of six
> hours in an eight-hour workday, would be able to stand
> and/or walk for one-hour at a time for a total of six
> hours in an eight-hour workday . . .  This person
> would need a sit/stand option being defined as sitting
> for one-hour and then that person would have to be
> allowed to stand up for two to three minutes and then

could return to sitting if necessary.  This person
would occasionally be able to climb stairs and ramps,
would never be able to climb ropes, ladders and
scaffolds, would occasionally be able to stoop and
crouch, kneel and crawl.  This person would be able to
understand and carry out instructions consistent with
an SVP of 3, which would be not only simple
instructions but some detailed but not complex
instructions consistent with the lower end of
semiskilled type work.  This person would be able to
maintain concentration, persistence and pace for two-
hour increments over an eight-hour workday, over 40-
hour workweek and . . . this person would be able to
adapt to or deal with changes in the workplace that
were minor.

R. 79-80.  The VE testified that a person with that profile

could work:

A small parts assembler position, and that would be
45,000 [jobs exist] nationally, the DOT for that is
726.687-034, light with an SVP of 2, unskilled.  A
mail sorter position and that would be 48,000
positions nationally, the DOT for that is 209.687-026,
light with an SVP of 2, unskilled.  An inspector
position, and that would be 54,000 positions
nationally, the DOT for that is 716.687-014, light
with an SVP of 2, unskilled.  I reduced all the jobs
by 50% to allow for the change in positions that were
stated in the hypothetical, and that part of it is
based on my experience, the DOT does not provide that.

R. 81.  Newman's representative did not follow up regarding

the methodology for reducing the number of jobs nationally.

R. 82-84.

    In his decision, the hearing officer found "the following

severe impairments: degenerative dis[c] [sic] disease of the

lumbar spine, fibromyalgia, Morton's neuroma of the third

**11**

interspace of the right foot; [sic] dysthymic disorder, and
anxiety disorder." R. at 17. At step three of the Sequential
Evaluation he determined that the claimant did not have an
impairment or combination of impairments that meets or medically
equal a listing. R. 18-19. Specifically, he found that "the
claimant's physical impairments do not have sufficiently severe
objective findings of functional limitations to be considered
presumptively disabled at this step of the sequential process."
R. 18. With respect to the paragraph B criteria of the mental
impairments listings, he found that Newman had a mild limitation
in "understanding, remembering or applying information;"
"interacting with others;" and "adapting or managing herself"
and a mild to moderate limitation in "concentration, persistence
or maintaining pace." R. 18-19.[1] The hearing officer also wrote
that the claimant's symptoms failed to meet the criteria of part
C of the mental health listings. R. 19.

The hearing officer determined that Newman had the
following residual functional capacity ("RFC"):

> to lift and carry 20 pounds occasionally and 10 pounds
> on a frequent basis; sit 1 hour at a time for a total
> of 6 hours in an 8-hour workday; stand and/or walk for
> 1 hour at a time for an 8-hr workday; would need a
> sit/stand option being defined as sitting for 1 hour

---

[1] In order for a claimant to meet the requirements of part B
of the listing, she must have a "marked" limitation in two or
more of the functional areas listed or an "extreme" limitation
in one or more areas. 20 C.F.R. ch. III, § 404, subpart P, app.
1, § 12.00(A)(2)(b).

and then allowed to stand for 2-3 minutes and return
to sitting if necessary; occasionally climb stairs and
ramps, but never climb ropes, ladders and scaffolds;
and occasionally stoop, crouch, kneel and crawl.
Additionally, she could understand and carry out
simple instructions and some detailed but not complex
instruction consistent with the lower end of semi-
skilled type work and consistent with an SVP of 3;
could maintain concentration, persistence, and pace
for 2 hour increments over an 8-hour workday, 40-hour
workweek; and would be able to adapt to minor changes
in the workplace.

R. 19.  He went on to determine that Newman was not disabled under the Sequential Evaluation.  R. 30.  He determined that the objective medical evidence and Newman's reports of her daily activities did not support disabling functional limitations.  R. 25.  He gave little weight to Dr. Kulich's EAEDC report because he found it "inconsistent with the claimant's contemporaneous treatment notes that show improvement in her psychiatric symptoms with medication and therapy."  R. 26.  He also gave little weight to Dr. Kulich's February 6, 2017 and February 13, 2017 opinion explaining:

Treatment notes indicate improved mood, sleep, and
anxiety with medication . . .  The claimant noted
socializing with friends and family, participating in
Bible study, attending church regularly, and doing
volunteer work without any indication of trouble
getting along with others.  The claimant's mental
status examination [sic] were generally within normal
limits without acute abnormalities other than somatic
concerns.  Further, the claimant's memory and
concentration has not been noted in the longitudinal
record to be so limited that she would be unable to
attend to simple, unskilled tasks.  The statement and
opinions of Dr. Kulich are given less weight to the

> extent they assert greater limitations than suggested
> by contemporaneous medical evidence and the record as
> a whole.

R. 28.  The hearing officer further noted that he gave "little
weight to the letter by Dr. Wilfong."  R. 27. He explained that
Dr. Wilfong's assessment was not supported by treatment notes
and that his letter was conclusory "without providing references
to medical evidence to support his opinion".  R. 28.  The
hearing officer gave partial weight to Dr. Wilfong's assessment.
Id.  He gave some weight to the lifting and carrying
restrictions and postural considerations, but found that the
remainder of the assessment was more restrictive than the record
suggested and was inconsistent with medical evidence, citing
contemporaneous treatment notes.  Id.  The hearing officer
finally found that Newman could perform the requirements of the
positions the Vocational Expert indicated in testimony, using
the DOT numbers she provided.  R. 30.

## II.  ANALYSIS

Newman raises four distinct issues.  First, whether the
hearing officer's failure to consider Newman's Somatic Disorder
at steps two and three of the Sequential Evaluation is an error
at law warranting reversal or remand.  Pl.'s Mem. 8-9. Second,
whether the hearing officer made his RFC finding appropriately.
Id. at 9, Pl.'s Reply 2.  Third, whether the hearing officer's
reliance upon the testimony of the VE was an error at law, Pl.'s

Mem. 16.  Finally, she challenges whether the hearing officer's analysis of subjective pain symptoms was in accordance with the law.  Compl. ¶ 13(d).  Of these four arguments, her argument that the hearing officer inappropriately determined her RFC has merit.

### A.  Legal Standard

#### 1.  The Sequential Evaluation under the Social Security Act

The Social Security Act provides that hearing officers must evaluate claims according to a five-step sequential evaluation ("Sequential Evaluation").  20 C.F.R. § 404.1520(a)(1).

The first step is determining whether the claimant is engaging in substantial gainful activity, defined as earnings from a work-setting exceeding an amount that the Social Security Administration sets each year.  20 C.F.R. §§ 404.1520(a)(4)(i), 404.1574(b).

At the second step, the hearing officer determines whether impairments are "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment or combination of impairments is severe if it significantly limits and individual's ability to engage in basic work activities.  20 C.F.R. § 404.1520(c).  The standard at the second step is not meant to be demanding.  McDonald v. Secretary of Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986)

At step three, the hearing officer assesses whether the claimant's impairments meet or equal the severity of a listing. 20 C.F.R. § 404.1520(a)(4)(iii). These so-called listings are Social Security standards of diagnoses establishing a condition is severe enough that the claimant is presumptively disabled. 20 C.F.R. § 404.1525.

If a claim does not meet the severity of a listing at step three, the inquiry does not end. 20 C.F.R. § 404.1520(e). Instead, the hearing officer proceeds to step four and assesses the RFC of the claimant. Id. The RFC reflects the claimant's ability to do physical and mental work-related tasks on a sustained basis. 20 C.F.R. § 404.1545(a)(1). RFC determinations must consider all the claimant's impairments (including severe and non-severe impairments). 20 C.F.R. § 404.1545(a)(2). The hearing officer then uses the RFC determination to decide whether the claimant can return to past relevant work. 20 C.F.R. § 404.1520(e).

If the claimant's RFC would not allow her to return to past relevant work, the hearing officer continues to step five of the Sequential Evaluation. 20 C.F.R. § 404.1520(a)(4)(v). At step five, the burden of proof shifts to the Social Security Administration to establish that a person of the same age, education, work experience, and RFC could do work that exists in significant numbers in the national economy. 20 C.F.R. §

404.1560(c)(2); 20 C.F.R. § 404.1512(b)(3).  To meet this
burden, the Social Security Administration uses its Medical
Vocational Guidelines (the "grid"): a comprehensive list of
rules that guide a hearing officer's determination of whether a
claimant is disabled based on age, work-experience, education
and exertional capacity.  20 C.F.R. § 404.1569a(b); 20 C.F.R.
Part 404, Subpart P, App. 2.  The grids have five exertional
categories: sedentary, light, medium, heavy and very heavy.  20
C.F.R. Part 404, Subpart P, App. 2.

Because claimant profiles are often more complicated than
the grids account for, typically the Social Security
Administration has a VE testify at the hearing regarding what
types of jobs are available to people with RFCs corresponding
with the claimant's and what the requirements of those jobs are.
See 20 C.F.R. § 404.1566(e).  The VE may rely on her experience
during testimony.  Biestek v. Berryhill, 139 S. Ct 1148, 1152-53
(2019) ("When offering testimony, the experts may invoke . . .
data otherwise developed from their own experience . . .")
(citation and quotations omitted).

The Social Security Administration also relies upon the
Dictionary of Occupational Titles ("DOT"), a comprehensive list
of jobs and descriptions, for the VE to identify jobs that the
claimant might be able to perform.  20 C.F.R. § 404.1566(d)(1);
See Purdy v. Berryhill, 887 F.3d 7, 14 (1st Cir. 2018); U.S.

Dep't of Labor, Dictionary of Occupational Titles (4th ed. 1991) (available at https://occupationalinfo.org) (last visited July 16, 2020). DOT descriptions are presumed to accurately describe the work as typically performed including how strenuous the work is and the level of skill needed to perform it satisfactorily. 20 C.F.R. § 404.1566(d)(1). VE testimony that deviates from the DOT descriptions necessitates an explanation. SSR 00-4p.[2]

The DOT has a standardized scheme for denoting how strenuous a job is or how much skill it takes to perform. DOT, Appendix C. The DOT denotes occupations as sedentary, light, medium, heavy and very heavy, which corresponds with the grid and the grid's definition. 20 C.F.R. § 404.1569a(a). The DOT also indicates how complex or skill-dependent a job is by offering a numerical Specific Vocational Preparation ("SVP") rating between 1 and 9. DOT, Appendix C. Lower SVP numbers indicate that the job requires less skill or time to learn. Id. "Unskilled" jobs have SVPs of 1 or 2, "Semi-skilled jobs" have SVPs of 3 or 4, and "Skilled" jobs have SVPs of 5 and up. SSR OO-4p.

---

[2] The DOT has not been updated since 1991, and given the changes in technology in the intervening twenty-nine years, it is not necessarily accurate in reflecting either what jobs exist in the national economy or their numbers. See Purdy, 887 at 17, n.10.

If the hearing officer finds that the claimant can do work that exists in significant numbers in the national economy given her RFC, age, education and work experience, then the hearing officer will find the claimant not disabled.  20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1566(b).

### 2.   The Standard of Review

Courts review the factual findings of the Commissioner based on the substantial evidence standard.  Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."  Biestek, 139 S. Ct at 1154 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The reviewing court need not agree with the hearing officer's weighing of the evidence in order to affirm it.  See Purdy, 887 F.3d at 13 ("the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the hearing officer] not for . . . the courts.") (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Substantial evidence need only be enough that a person of "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion."  Id. (quoting Rodriguez, 647 F.2d at 222).

### B.   The Hearing Officer's Failure to Consider Newman's Somatic Disorder at Steps 2 and 3 of the Evaluation

In his written decision, the hearing officer did not include Newman's Somatic Symptom Disorder as a "Severe Impairment" or evaluate her Somatic Symptom Disorder under the Social Security Listing for Somatic Symptom and Related Disorders.  R. 17-19.  Newman argues that because the medical records show that she was diagnosed with Somatic Symptom Disorder and her symptoms are well-documented, the hearing officer erred in not evaluating her under the Somatic Symptom Listing at step three of the Sequential Evaluation, and his decision is therefore not based on substantial evidence.  Pl.'s Mem. 8-9.

The Commissioner argues that the hearing officer's failure to evaluate Newman's Somatic Symptom Disorder under a listing was, at most, harmless error.  Def.'s Mem. 5.  Slightly misstating the applicable standard, the Commissioner argues that to be found disabled under the Somatic Symptom Listing, Newman would need to meet the criteria of both parts A and B of the listing.[3]  Id.  Because the part B criteria of listing 12.07 are

---

[3] The psychiatric impairment listings require that a claimant meet the requirements of parts A and B of the listing or parts A and C of the listing.  As explained below, this distinction makes no difference here because the hearing officer found that Newman did not meet the requirements of parts B or C of the mental health listings he considered.

identical to the part B criteria of listings 12.04 and 12.06, which the hearing officer explicitly considered, the Commissioner argues that the hearing officer's findings would not have changed merely because he considered another listing with the same criteria.  Id.  (citing Coppola v. Colvin, Civ. No. 12-cv-492-JL, 2014 U.S. Dist. LEXIS 21931, at *8-11 (D.N.H. Feb. 21, 2014)).  The Commissioner also notes that Newman failed to challenge the hearing officer's decision not to designate Somatic Symptom Disorder a "severe impairment," which is a prerequisite for the hearing officer's evaluation of the diagnosis under a listing.  Def.'s Mem. 5 n.4.

The Commissioner has the better argument on this point, even were Newman's Somatic Disorder to clear the "severe" threshold.  The Commissioner is correct that for the hearing officer to consider a diagnosis at the listing, he would first have to find a "severe impairment" at the second step of the sequential evaluation.  See 20 C.F.R. § 404.1520(a)(4)(iii). The "severe impairment" requirement is a "de minimis policy, designed to do no more than screen out groundless claims." McDonald, 795 F.2d at 1124.  Newman's Somatic Symptom Disorder likely meets this de minimis standard.  In Cohen v. Astrue, the court found that the claimant's eye impairment was severe because her optometrist indicated that the symptoms resulted in "significant glare, distortion, blurred vision and photo phobia"

and she was unable to wear glasses.  519 F. Supp. 2d 170, 175-76
(D. Mass. 2007) (Neiman, M.J.).  This evidence was "more than
sufficient to require a finding of severity."  Id. at 176.
Similarly, the evidence that Newman's Somatic Symptom Disorder
was linked with increased pain and the exacerbation of her other
psychiatric impairments clears the low bar for severity.  R.
556, 580, 777, 860.  The fact that the hearing officer did not
find a severe impairment at step two is therefore an error.

Yet this error, as the Commissioner argues, is harmless.
For the hearing officer's failure to evaluate Newman's Somatic
Symptom Disorder at steps two and three of the Sequential
Evaluation to be prejudicial, resolving the error would need to
be outcome determinative.  See Perez Torres v. Sec'y of Health
and Human Servs., 890 F.2d 1251, 1255 (1st Cir. 1989).
Evaluating Newman's Somatic Symptom Disorder under listing 12.07
would not have changed the hearing officer's decision.  All
listings for mental health related impairments are structured
such that the claimant must demonstrate that she meets the
criteria of parts A and B or parts A and C.  20 C.F.R. ch. III,
subpart P, app. 1, § 12.00(A)(2).  Parts B and C share identical
criteria in this regard.  Id.

At step three of Newman's other mental health impairments,
the hearing officer found that Newman's symptoms did not meet
the requirements of parts B and C of the listings.  R. 19.  The

inclusion of another listing would neither have altered the analysis of parts B and C of the listing, nor the determination that she did not meet the symptoms' criteria.  Cf. J.B. v. Astrue, 738 F. Supp. 2d 260, 265 (D. Mass. 2010) (Gorton, J.) ("[E]ven if the ALJ erred in determining that J.B. did not suffer marked limitations on [one domain] his error was harmless unless plaintiff can show that J.B. suffered marked limitations in another domain as well.")  Given that Newman's Somatic Symptom Disorder would not have met or equaled the listing, and thus not changed the outcome at step three, the error was harmless.  Reversal or remand on this ground is not warranted.

### C.  The Hearing Officer's RFC Determination

The hearing officer found Newman capable of completing the full range of sedentary and light work with a sit/stand limitation.  R. 19-20.  Newman argues that this determination was in error for four reasons:  First, the Hearing Officer erred in not giving more weight to Newman's treating sources.  Pl.'s Mem. 10.  Second, the hearing officer made a harmful error in his evaluation of Newman's fibromyalgia.  Reply 2.  Third, the hearing officer "improperly substituted his own opinion" of Newman's RFC.  Pl.'s Mem. 14.  Fourth, the hearing officer erred in relying on evidence of Newman's daily activities to support his RFC finding.  Pl.'s Mem. 15.  Newman further argues that each of these errors is harmful, warranting reversal or remand.

The Commissioner argues none of the determinations was in error. See generally Def.'s Mem.

### 1.    The Hearing Officer's Weighing of Treating Source Opinions

For claims filed before March 27, 2017, Social Security regulations require that the hearing officer give controlling weight to treating source opinions provided they are well-supported by medical evidence and are not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  In cases where the hearing officer does not give controlling weight to the treating source opinions, the regulation requires that she apply the following factors to determine the appropriate weight for that medical opinion: length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization and other factors (e.g. the treating source's familiarity with Social Security programs).  20 C.F.R. 404.1527(c).  The hearing officer did not give controlling weight to the opinions of Newman's psychologist Dr. Kulich or Dr. Wilfong.  R. 27-29.  Newman asserts that both doctors' opinions were entitled to controlling weight under the regulations, that the hearing officer did not properly assess the factors to determine their appropriate weight, and that he engaged in impermissible weighing of "raw medical data."  Pl.'s

Mem. 12-14 (citing Nguyen v. Chater, 172 F.3d. 31, 35 (1st Cir. 1999)).  The Commissioner argues that the hearing officer's decision is justified because he determined, among other things, the opinions were not consistent with other evidence in the record.  Def.'s Mem. 10-13.

### a.   Fibromyalgia

Newman develops the best argument on this point in her Reply brief, focusing on the debilitation caused by her fibromyalgia.  Newman argues that the hearing officer incorrectly analyzed the fibromyalgia diagnosis and accompanying pain symptoms in order to discount the testimony of her treating physicians.  Pl.'s Reply 2.  Furthermore, she argues, the "raw medical data" he interpreted does not contradict Newman's claims about the severity of her fibromyalgia because the condition "is characterized by normal musculoskeletal and neurological examinations and no laboratory abnormalities."  Pl.'s Reply 2 (citing Johnson v. Astrue, 597 F.3d 409, 409 (1st Cir. 2009) (per curium) (holding hearing officer's direct interpretation of the raw medical data in assessment of claimant's fibromyalgia harmful error warranting reversal and remand)).

The hearing officer provided the following reasons for discounting Newman's reports of the severity of her pain:

> The record reflects complaints of pain by the claimant throughout the record; however, the substantial evidence of record fails to support the claimant's

testimony regarding the severity and resulting
limitations.  Radiological studies of the lumbar spine
show some contact with the L5 nerve root, but mild
degenerative changes and no major stenosis within the
lumbar spine (Ex. 31F and 33F/0.28).  EMG studies have
been normal (Ex. 32F and 33F/p.331).  The claimant's
treatment for her back symptoms have been conservative
with no indications for surgery.  Treatment notes
indicate that the claimant had some improvement in the
back and fibromyalgia related complaints with physical
therapy (Ex. 19F).  Further, the claimant's
examination throughout the longitudinal record show,
but normal gait, intact strength in all extremities,
intact sensation, and no acute neurological deficits
(Ex. 6F, 0F, 13F, and 23F).  With regard to the
neuroma, treatment notes indicate she was prescribed
orthotics with no further follow-up.

R. 25.

At the May 19, 2020 hearing, the Commissioner argued that
the hearing officer appropriately weighed the evidence in the
record to determine Newman's fibromyalgia was not disabling.
The Commissioner cited to Andrade-Hermort v. Berryhill, for the
proposition that there must be "sufficient objective evidence"
of Newman's limitations to allow a finding of disability.  292
F. Supp. 3d 530, 532 (D. Mass. 2018) (Zobel, J.) (quoting SSR
12-2P, 2012 SSR LEXIS 1, at *2).  The Commissioner also cited to
Coe v. Colvin for the similar proposition that objective
evidence is a useful indicator of the "intensity and persistence
of an individual's symptoms."  Civ. A. No. 15-30037, 2016 U.S.
Dist. LEXIS 77942, at *24-25 (D. Mass. June 15, 2016)
(Mastroianni, J.).  The Commissioner further argued it was
appropriate for the hearing officer to discount Newman's

treating physicians because of the lack of objective evidence, and that the state agency physicians had not found her pain to be disabling, so his conclusions were supported by substantial evidence.

Newman has the better of this argument because the reasons the hearing officer gives in discounting her treating physician's opinions raise the same problems as the reasoning in Johnson, 597 F.3d 409.  As a result, his decision to give only partial weight to Dr. Wilfong's analysis is not supported by substantial evidence.  See Santana v. Colvin, Civ. A. No. 15-cv-13232, 2016 U.S. Dist. LEXIS 178036, at *11 (D. Mass. Dec. 23, 2016) (Talwani, J.).

Johnson, 597 F.3d 409, is the leading case on fibromyalgia diagnosis in the First Circuit.  In Johnson, the First Circuit remanded for further consideration because the hearing officer "provided several unpersuasive reasons for th[e] decision" to provide "little weight" to the claimant's treating rheumatologist.  597 F.3d at 411.  There, the hearing officer provided the following reasons for discounting the treating physician: first, the claimant had only seen that treating source three times during the relevant period; second, the claimant had shown improvement after receiving injections; third, the hearing officer found the treating source's prescription of physical therapy and aerobic exercise

inconsistent with the severity of his assessment; and fourth, the hearing officer did not find the treating source's opinion credible because it was based on subjective allegations of pain. Id. at 411-12.  The First Circuit evaluated each reason in turn, with the second, third, and fourth reasons relevant here.  The court noted that temporary improvement is commonplace for fibromyalgia patients after injections and this note was the only record indicating improvement.  Id. at 411.  The court also noted that the treating source's prescription was appropriate to treating fibromyalgia.  Id. at 412.  Finally, because the patient's subjective allegations of pain were a crucial diagnostic tool for fibromyalgia cases, the treating source's reliance on the patient's reports of pain was entirely appropriate.  Id.  The court went on to say that the hearing officer's reliance on other physician's opinions was inappropriate because they were not examining physicians and they either entirely ignored the fibromyalgia diagnosis or misunderstood the condition.  Id.

Examining each of the reasons from Johnson, the temporary improvement from trigger-point injections is relevant.  In the present case, the hearing officer found that "the medical evidence and the record as a whole did not support disabling impairments . . . .  Treatment notes indicate that the claimant has had some improvement in the back and fibromyalgia related

complaints with physical therapy (Ex. 19F)."  R. 25.  The
exhibit the hearing officer refers to contains a
Physical/Occupational Therapy note from June and July of 2017.
The note indicates that the patient reported current pain that
was "10/10," that she was experiencing ongoing pain, and that
"she was treated by physical therapy with good success.
However, she reports she was unable to continue to do her
exercise without the manual soft tissue work and supervision for
the exercises."  R. 1120.  Like in Johnson, the hearing officer
appears to have focused on a single note indicating improvement
in pain and used that to support a finding that Newman's
fibromyalgia was not disabling, a conclusion not supported by
the context of that report and the record as a whole.  R. 26,
1120.

The issue of prescribed treatment in Johnson is also
relevant to the present case.  The hearing officer noted in
support of his decision that the record reflected that "[t]he
claimant's treatment for her back symptoms has been conservative
with no indications for surgery."  R. 25.  Medical evidence
indicated that surgery was inappropriate precisely because of
concerns about Newman's fibromyalgia, as the hearing officer
himself notes earlier in his opinion.  R. 22, 1156.
Furthermore, as Johnson makes clear, physical therapy and
aerobic exercise are appropriate treatments for a person with

fibromyalgia, so the "conservative" nature of her treatment in
no way indicates that Newman's impairments are not disabling.
597 F.3d at 412.

Finally, the issue of subjective reporting in Johnson is
relevant.  Although in the present case the hearing officer does
not say he rejected Dr. Wilfong's opinion because it was based
on subjective allegations of pain, the hearing officer does say
that Dr. Wilfong's opinion is inconsistent with medical
evidence.  See R. 28-29.  Since Dr. Wilfong's opinion was based
on Newman's subjective report of her chronic pain, the inference
is that the hearing officer does not credit the opinions'
characterization of her pain as disabling because there is
insufficient objective evidence backing it up, exactly as was
the case in Johnson.  Id.  Though the hearing officer does
accept the diagnosis of fibromyalgia, like in Johnson he erred
in dismissing the treating physician's analysis of its severity
because it lacked "objective medical evidence," when
fibromyalgia is characterized by exactly this dearth of
objective medical evidence, and the objective evidence available
was therefore not inconsistent with the diagnosis.  Id. at 29.

In sum, the second, third and fourth reasons from Johnson
support Newman's motion for remand or reversal.  Additionally,
the other reasons the hearing officer cites to discount the
severity of Newman's pain, such as the physical state of her

spine and the fact that she has intact strength in her
extremities, R. 25, do not actually contradict the finding that
her fibromyalgia was debilitatingly severe.  See Santana 2016
U.S. Dist. LEXIS 178036, at *11-13 (noting that a lack of
physical deformities does not contradict a finding of severe
fibromyalgia when the patient self-reports symptoms consistent
with the condition).  Fibromyalgia is characterized by normal
musculoskeletal and neurological examinations, so normal
findings on these dimensions (or in this case, finding that
spinal degeneration was "mild") is fully consistent.  Id. at *12
(citing Johnson, 597 F.3d at 410).  Other cases from this
Circuit the Commissioner cites are distinguishable.

In Andrade-Hermort, the court upheld (on reconsideration)
the Commissioner's finding of a "light" RFC determination for an
applicant suffering from fibromyalgia.  292 F. Supp. 3d at 532-
34.  The court held that the Commissioner had appropriately
applied the two-step process laid out in SSR 96-7 and SSR 12-2p
for evaluation whether fibromyalgia is disabling, which requires
the hearing officer to first determine whether the evidence
supports a finding of a pain-producing illness, and second to
determine if the evidence supports a sufficient finding of
severity to constitute disability.  Id. at 533 (citing SSR 96-
7p, 1996 SSR LEXIS 4 at *4 (describing two-step process) and SSR
12-2p, 2012 SSR LEXIS 1 at *13 (providing guidance on evaluating

fibromyalgia)).  The court distinguished Johnson by noting that though objective medical evidence may not be available to prove the existence of fibromyalgia, a hearing officer may require objective evidence to indicate its severity and evaluate the applicant's credibility.  Id.  The hearing officer found the Andrade-Hermort's self-reports of the severity of her pain not wholly credible, and key to the court decision to uphold this analysis was that no treating physician had provided an assessment supporting her limitations.  Id. at 533-34 (quoting Barowsky v. Colvin, 2016 U.S. Dist. LEXIS 19118, at *14 (D. Mass. Feb. 17, 2016) (Robertson, M.J.) ("What is missing from the administrative record in this case is any assessment by a treating care provider that supports Plaintiff's claims of disabling functional limitations attributable to fibromyalgia.")).

Here, in contrast, there is a letter by Dr. Wilfong saying Newman's medical conditions "limit exertion or sustained periods of standing" due to physical ailments resulting from her chronic pain, R. 1124, with the rest of her record indicating fibromyalgia was a significant factor.  R. 1133.  Dr. Kulich also indicates "multiple areas of disability across domains" as a result of Newman's chronic pain, R. 1038, and states that the pain is closely linked to Newman's mental disorders.  R. 1188. The issue in this case is therefore whether the hearing

officer's rejection of the treating physicians' conclusions was reasoned, rather than the freestanding credibility inquiry that took place in Andrade-Hermort.

This is the same question addressed in Coe, where the court upheld the hearing officer's decision to give little weight to the treating physician's diagnosis of disabling pain when it was not supported by the actual record. 2015 U.S. Dist. LEXIS 77942, at *21-22. In that case, the claimant's four treating physicians differed significantly on the severity of her fibromyalgia, and the one treating physician who found the pain disabling could not point to corroborating documentation in the record. Id. Here, in contrast, the opinions of Newman's treating physicians are not inconsistent with their own records of the severity of her pain; for example Dr. Wilfong's report indicates pain as high as "10/10," and that her pain has a clear causal nexus to her well-documented injuries. R. 1120. Other treatment records indicate that even when she was taking Celexa and other pain medications she self-reported pain so severe that it rendered her unable to work at Dunkin' Donuts. R. 756. Furthermore, there are no treating physicians who have suggested her pain is not disabling, which would require the hearing officer to weigh their respective credibility. See 2016 U.S. Dist. LEXIS 77942, at *23. The physicians who concluded Newman's pain was not disabling were the non-treating

physicians, R. 26, but their opinions must be treated with less weight than the treating physicians if both are consistent with the record.  20 C.F.R. § 404.1527(c)(2).

This Court therefore finds the record as a whole is fully consistent with the treating physicians' diagnosis of the severity of Newman's pain.  Because the hearing officer was required to provide substantial reason to find the opinions inconsistent with the record or unsupported by medical evidence, and the reasons he required do not survive scrutiny, remand is necessary to determine if the treating physicians' opinions deserve controlling weight on the issue of whether her fibromyalgia was disabling.  See 20 C.F.R. § 404.1527(c)(2); Santana, 2016 U.S. Dist. LEXIS 178036, at *16-17.

### b.   Other Factors

The hearing officer's analysis of Newman's other health issues to determine if her treating physicians' opinions should control did not suffer from the same errors in analysis, and do not require remand.

Newman argues that Dr. Kulich's opinion is entitled to controlling weight.  Newman notes that the hearing officer asserted he rejected Dr. Kulich's medical opinion because it was "inconsistent with contemporaneous treatment notes."  Pl.'s Mem. 13; R. 27.  She asserts that the hearing officer based his rejection of the medical opinion on evidence that was cherry-

picked from the record and that the hearing officer "was not at liberty to ignore medical evidence or substitute his own view for uncontroverted medical opinion." Pl.'s Mem. 13 (quoting Nguyen, 172 F.3d. at 35). The Commissioner responds that Newman cannot meet "her burden on substantial evidence review merely by pointing to evidence she believes support the doctor's opinion." Def.'s Mem. 8. He further argues the hearing officer's determination was justified because the evidence in the record is truly mixed. Id. at 7.

The hearing officer determined that Dr. Kulich's opinion should not have controlling weight only upon offering specific examples of areas where they did not quite match the record, such as her record of improving mood, sleep, and anxiety with medication. R. 27. The record of Newman's psychological limitations is sufficiently mixed that this Court cannot say the hearing officer's decision was against the substantial evidence. See e.g., R. 767-773. Therefore "[w]e must uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez, 647 F.2d at 222.

The next step in the analysis is to determine whether, if Dr. Kulich's opinion is not entitled to controlling weight, the hearing officer correctly evaluated the factors to determine how

much weight to give the treating source opinion.  SSR 96-2p; 20
C.F.R. § 404.1527(c)(2).  The hearing officer does not offer an
exhaustive discussion of each factor, but he is not required to
do so.  Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass.
2015) (Hillman, J.).  The only factors noted in the hearing
officer's decision are supportability and consistency.  R. 18-
29.  This provides sufficient balancing to determine that the
doctor's opinion is entitled to less weight.  See Conte v.
McMahon, 472 F. Supp. 2d 39, 48 (D. Mass. 2007) (holding that
discussing only lack of consistency as a reason for diminished
weight given to the treating source opinion was sufficient to
satisfy the balancing test required by the regulation).  In sum,
because the medical evidence (excluding for fibromyalgia) is not
entirely consistent with Dr. Kulich's opinion, this Court must
defer to the hearing officer's decision to give it partial
weight.

Newman makes a similar argument regarding the hearing
officer's assessment of Dr. Wilfong's opinion.  Pl.'s Mem. 11-
13.  Newman notes that the hearing officer gave "little weight"
to Dr. Wilfong's letter and "partial weight" to his medical
assessment.  Pl.'s Mem. 11; R. 27-28.  This is potentially an
error if the hearing officer failed to "give good reasons in
[his] notice of determination or decision for the weight [he
gave the] treating source's medical opinion."  20 C.F.R. §

404.1527(c)(2).  The Commissioner responds that Newman's
argument is "manifestly wrong since the hearing officer
explained, after accepting Dr. Wilfong's lifting and carrying
limitations, that he found 'the remainder' of Dr. Wilfong's
assessment 'more restrictive than suggested by the record' and
he cited evidence to support that finding."  Def.'s Mem. 11
(citing R. 28).

As explained above, the hearing officer's analysis of the
fibromyalgia issue does not constitute a good reason to discount
Dr. Wilfong's conclusions.  20 C.F.R. § 404.1527(c)(2).  This
issue of fibromyalgia is wrapped up in Dr. Wilfong's overall
analysis, such as assigning her a GAF score of 45-50.  R. 1124.
The hearing officer's other reasoning in giving partial weight
to Dr. Wilfong's letter and assessment of Newman's physical
capabilities were appropriate on their face, and he did accept
Dr. Wilfong's opinion insofar as it was consistent with the
medical evidence.  R. 28.  The problems with the fibromyalgia
analysis, however, render it unclear whether the remainder of
the hearing officer's discussion survives.  Id.  On remand, it
is therefore appropriate for the hearing officer to consider
related aspects of Dr. Wilfong's opinion, such as the second-
order effect of Newman's pain on her GAF and ability to conduct
physical tasks.  R. 28, R. 1125-1130.

2.      **The Hearing Officer's Alleged Substitution of his Lay Opinion for Medical Opinion in support of RFC Determination**

Newman next argues that the hearing officer "improperly substituted his own opinion of [Newman's] Residual Functional Capacity" for medical opinion.  Pl.'s Mem. 14.  She supports this contention by stating that "[n]o medical expert having reviewed the entire record offered any opinion" from which the hearing officer could have drawn the specifics of his RFC determination.  Id.  According to Newman, this was in error because "as a lay person . . . the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."  Id. (quoting Nguyen, 172 F.3d at 35).

 The Commissioner responds that aggregating relevant medical facts from multiple medical sources and opinions does not mean that the hearing officer employed inexpert lay medical judgment.  Def.'s Mem. 12 (citing Evangelista v. Secretary of Health and Human Services, 826 F.2d 136, 144 (1st Cir. 1987) ("[T]he notion that there must always be some super-evaluator, a single physician who gives the factfinder an overview of the entire case -- is unsupported by the statutory scheme, or by case law, or by common sense, for that matter.")).

It is not for the hearing officer to interpret raw medical data, but the hearing officer may nevertheless examine the

underlying data when determining the relative weight to give

competing sources.  20 C.F.R. § 404.1527(c)(3)-(4).  Unlike in

Nguyen, the hearing officer in this case could point to expert

evaluations that are consistent with a finding of no disability.

See R. 26 (citing 92-105, R. 108-123), cf. Nguyen, 172 F.3d at

35 (calling the medical opinion the hearing officer rejected

"uncontroverted").  Here, the hearing officer's synthesis and

weighing of evidence from multiple sometimes-competing sources,

is a judgment call within his authority.  Evangelista, 826 F.2d

at 144.

### 3.      The Hearing Officer's Reliance on Newman's Reported Daily Activities to Support RFC Finding

Newman argues that the hearing officer based his RFC

assessment on Newman's daily activities, and that this was

inappropriate because tasks that "do not require the sustained

effort necessary for any substantial sustained, and regular

gainful employment" do not allow the hearing officer to conclude

that the claimant is capable of sustained regular gainful

employment.  See Pl.'s Mem. 15 (quoting Waters v. Bowen, 709 F.

Supp. 278, 284 (D. Mass. 1989)).  The Commissioner responds that

hearing officer RFC assessments must be based on all relevant

evidence in the record including reports of activities of daily

living, and that the reports in this case did not provide the

sole evidence for the determination.  Def.'s Mem. 14-15; SSR 96-7p.[4]

The Commissioner has the better of this argument.  He correctly points out that hearing officers are explicitly required by regulation to consider activities of daily living.  See Def.'s Mem. 14 (citing SSR 96-8p, 1996 SSR LEXIS 5, at *14).  While Newman is correct that tasks not requiring sustained and regular effort do not alone indicate that a claimant is able to engage in full-time work, see Ormon v. Astrue, 497 Fed. Appx. 81, 87 (1st Cir. 2012), the hearing officer's analysis here does not suggest that.  Instead, the hearing officer used reports of daily activities combined with other evidence in the record to come to his conclusion about the claimant's RFC, which is entirely consistent with the law.  R. 25; see, e.g., Coskery v. Berryhill, 892 F.3d 1, 7 (1st Cir. 2018); Purdy, 887 F.3d at 13.

### D.   Reliance on the Vocational Expert's Testimony

Newman brings two objections regarding the hearing officer's reliance upon the VE's testimony.  First, Newman notes that the occupational titles that the VE provided in testimony

---

[4] SSR 96-7p was superseded on March 28, 2016 by SSR 16-3p, but the two are substantially the same for this inquiry, as both contain identical language requiring hearing officers to consider the claimants' reports of activities of daily living as part of their analysis of subjective allegations of pain.  See SSR 96-7p, 1996 SSR LEXIS 4, at *8; SSR 16-3p, 2016 SSR LEXIS 4, at *18.

do not correspond to the DOT numbers.  Pl.'s Mem. 16-17.

Second, Newman argues that the hearing officer inappropriately

relied upon the VE's testimony regarding the number of jobs

available because her deviation from the DOT was based only on

her "experience" and thus not adequately supported.  Id. at 17-

19.

### 1.    Mismatched Occupational Titles and DOT Numbers

During the hearing, the VE testified that a person with the

RFC the hearing officer hypothesized and of the same age,

education, and work experience as the claimant would be able to

work as a Mail Sorter (DOT number 209.687-026), a Small Products

Assembler (DOT number 726.687-034), and an Inspector (DOT number

716.687-014).  R. 81.  Newman correctly notes that the latter

two occupations were not matched with their proper DOT numbers,

which should be 706.684-022, and 559.687-074 respectively.

Pl.'s Mem. 17; DOT §§ 706.684-022, 559.687-074.  The numbers

that the VE associated with the positions in error correspond

with the DOT listings for Masker and Glass Checker,

respectively.  DOT §§ 726.687-034, 716.687-014.  Notably, the

Masker and Glass Checker positions have an exertional level of

"light" and an SVP level of 2 ("unskilled"), aligning still with

the hearing officer's RFC determination and the descriptions of

the other titles that the VE offered in the hearing.  R. 19, 81.

Ordinarily, this would be straightforward harmless error because the corresponding DOT numbers were readily accessible and all five titles (corresponding to all the titles and numbers) share the same exertional level and SVP level.  DOT §§ 209.687-026, 726.687-034, 716.687-014, 706.684-022, and 559.687-074.  Newman argues the error is harmful because it resulted in the hearing officer making a determination without substantial evidence in light of the VE's remaining testimony.  Pl.'s Mem 17.  The VE testified that she was reducing the number of jobs available by fifty percent, given specific limitations in the hypothetical as to how the job would have to be performed.  R. 82.  Because of the mismatch in occupation title and DOT number, it is unclear whether the fifty percent reduction in available jobs corresponds to the number of jobs with that title or the number of jobs with that DOT number.  See Pl.'s Mem. 17.  Thus, Newman argues, it is impossible to know based on the available record whether the Social Security Administration has met its burden of establishing that there are significant numbers of jobs in the national economy that a person with Newman's profile could perform.  Id. at 17-19.

Although Newman is correct that it is impossible to tell whether the VE's testimony refers specifically to the job titles or the numbers, since all the jobs referred to are appropriate for someone with her RFC (including exertion level and skill-

level), there logically must be significant numbers of jobs in the national economy that are appropriate.  See 20 C.F.R. §§ 404.1520(4)(v), 404.1566(b); Green v. Astrue, No. 11-11711-PBS, 2013 U.S. Dist. LEXIS 23629, at *34-35 (D. Mass. Feb. 20, 2013) (Saris, J.).  Furthermore, the VE's testimony that 48,000 jobs exist in the mail sorter position is alone sufficient to show that jobs exist in the national economy.  R. 81.  Thus, the error is harmless.

### 2.    Explanation of VE's Deviation from the DOT regarding Number of Jobs

In her testimony, the VE was clear that the fifty-percent reduction in the number of jobs available did not come from the DOT, but rather from her own experience.  R. 83.  Newman argues that the hearing officer erred in relying on this part of the VE's testimony because the explanation for her deviation from the DOT's numbers was not adequately supported.  Pl.'s Mem. 17. In the event of this type of conflict, a hearing officer is instructed to "elicit a reasonable explanation for the conflict before relying on the VE [evidence] to support a determination or decision about whether the claimant is disabled."  SSR 00-4p, 2000 SSR LEXIS 8, at *5.  Newman argues the VE's citation to her experience does not satisfy the reasonable explanation requirement.  Pl.'s Mem. 18-19.  Newman relies on two cases to support her argument.  Id. (citing Gross v. Colvin, 213 F. Supp.

3d 229 (D. Mass. 2016) (Talwani, J.) and <u>Beede</u> v. <u>Colvin</u>, 16-cv-010-JL, 2017 U.S. Dist. LEXIS 13016, at *12 (D. N.H. 2017)).

The Commissioner responds with two arguments.  First, the Commissioner argues that VEs are not required to provide methodology in their testimony.  Def.'s Mem. 17.  The Commissioner cites to <u>Biestek</u>, where the Supreme Court held that there was no categorical rule requiring a VE to supply underlying data when it was requested.  139 S. Ct. at 1155.  Second, the Commissioner distinguishes the cases Newman cites because unlike here, an actual conflict existed between the jobs the VE identified and the RFC determination of the hearing officer.  Def.'s Mem. 19-20.

The Commissioner is correct on both counts.  First, the VE's invocation of her experience is sufficient reasonable explanation for the reduction from the DOT's job numbers.  In <u>Biestek</u>, the Supreme Court determined that a hearing office could rely upon the testimony of a VE, even though she refused to supply underlying data to support her conclusion, because her testimony itself constituted "substantial evidence."  139 S. Ct. at 1155.  Although in this case the issue is whether the VE's mere citation to her own experience satisfied the requirement that she provide a reasonable explanation for her deviation from the DOT, <u>Biestek</u>'s logic applies.  The VE in the present case and the VE in <u>Biestek</u> explained their testimony with evidence

that only would be accessible to them, experience and private surveys, respectively.  See R. 82; Biestek, 139 S. Ct. at 1155. This was acceptable in Biestek, so it follows that it is likewise acceptable here.  Furthermore, this Court has previously rejected (albeit in dicta) a similar challenge to a VE's job incidence testimony based on the VE's "thirty years of extensive experience."  Sinclair v. Berryhill, 266 F. Supp. 3d 545, 560 n.9 (D. Mass. 2017).

Second, the Commissioner is correct that the cases Newman cites do not weigh in her favor.  In Gross, the hearing officer provided a hypothetical RFC that permitted only two hours of walking or standing.  213 F. Supp. 3d at 234.  The VE there provided examples of light jobs and reduced their availability by half.  Id.  The VE failed to explain why a person who was limited to two hours of walking and standing total would be eligible for jobs characterized as primarily standing and failed to explain how he accounted for such a wide gap between what the DOT said was required and what he was said was required.  Id. at 235.  The court determined that the VE's testimony was not substantial evidence because he did not explain how he "estimated the jobs available when considering Gross' specific exertional limits."  Id.; 20 C.F.R § 404.1567(b).  In short, in Gross the hypothetical indicated that the person would be wholly incapable of performing the jobs as generally performed

according to the DOT.  In the present case, the hypothetical person could stand or walk for six hours in a workday, but would need to take short breaks, which is consistent with the DOT designation for light work.  R. 81.

Beede is similar.  In Beede, the hypothetical RFC was for a person who needed a job that was mostly seated, while the VE instead provided light jobs.  2017 U.S. Dist. LEXIS 13016, at *11.  Again, the VE's testimony did not provide substantial evidence because he failed to account for the gap between the primarily seated jobs that the hypothetical person could do and the primarily standing jobs that he suggested.  Id. at *11-12. In the present case, the person in the hypothetical could perform the basic requirements of light work, but would require the option to sit sometimes, a much smaller gap than the one at issue in Beede.  See R. 81.

In conclusion, the VE provided sufficient explanation for her deviation from the DOT, permitting the hearing officer to rely on her testimony in making his RFC finding.

## E.  The Hearing Officer's Treatment of Subjective Allegations of Pain

In her complaint Newman alleges that the hearing officer "misapplied the law and regulations in evaluating the Plaintiff's pain . . ."  Compl. ¶ 13(d).  Newman does not

develop the issue and the Commissioner does not reply to this allegation.  See generally Def.'s Mem.

Hearing officers evaluating a claimant's pain symptoms must follow a two-step process.  SSR 16-3p.  First, the hearing officer must determine "whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms."  SSR 16-3p, 2016 SSR LEXIS 4, at *5.  If the first step is satisfied, the hearing officer then evaluates the intensity and persistence of the pain to determine its limiting effects.  Id. at *4.  The evaluation contains two parts, consideration of the medical evidence and consideration of other evidence.  Id. at *5-6. In the "other evidence" category, the hearing officer evaluates factors which can include, insofar as they are relevant and present in the record:

> 1. Daily activities;
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3P, 2016 SSR LEXIS 4, at *18-19.  These factors are often referred to as the "Avery" factors after a case that codified them.  See Avery v. Department of Health and Human Services, 797 F.2d 19, 29 (1st Cir. 1986).[5]

While the hearing officer's analysis of Newman's pain stemming from fibromyalgia was inadequate, he did engage in the proper two-step inquiry.  First, he identified diagnoses that might reasonably produce pain (degenerative disc disease of the lumbar spine and fibromyalgia).  R. 18, 21.  He then determined that the objective medical evidence did not support the severity of the limitations that Newman alleged.  R. 26.  The next step in the analysis is determining whether the hearing officer adequately considered the Avery factors, though he "is not required to 'slavishly discuss all [Avery] factors relevant to analysis of a claimant's credibility and complaints of pain in order to make a supportable credibility finding.'"  Peters v. Colvin, 133 F. Supp. 3d 273, 282 (D. Mass. 2015) (quoting Amaral

---

[5] The Avery factors originally referenced SSR 96-7p, which was superseded by SSR 16-3p as of March 28, 2016, but the changes were with respect to credibility determinations and did not greatly disturb the criteria.  Cf. Cole v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016).  Avery and SSR 16-3p list similar factors, though SSR 16-3p adds the seventh "any other factor" consideration.  2016 SSR LEXIS 4, at *18-19.

v. _Commissioner of Soc. Sec._, 797 F. Supp. 2d 154, 162 (D. Mass. 2010)).

In his decision, the hearing officer explicitly considered the fourth and sixth _Avery_ factors (treatment besides medication and daily activities respectively).  R. 26-27.  This alone does not satisfy the requirement because it is not clear from his written findings that the hearing officer considered more than two of the _Avery_ factors.  See _Peters_, 133 F. Supp. 3d at 282, _Guyton_ v. _Apfel_, 20 F. Supp. 2d 156, 166 (D. Mass 1998).  Consideration of an _Avery_ factor during the hearing, however, satisfies this part of the inquiry.  See _Arrington_ v. _Colvin_, 216 F. Supp. 3d 217, 237 (D. Mass 2016) (Dein, M.J.).  The hearing officer elicited testimony about Newman's daily activities, the location of her pain, the medications she was taking and the side effects, treatment other than medication that she received for her pain, and other measures she took to alleviate her pain.  R. 58-61.  The hearing officer thus considered all six enumerated _Avery_ factors.  _Id._; _Avery_, 797 F.2d at 29.  This is sufficient to satisfy the two-part analysis.

**III. CONCLUSION**

For the aforementioned reasons, this Court ALLOWS Newman's motion to reverse and remand the decision of the Commissioner and DENIES the Commissioner's motion to affirm.  Newman's

application is REMANDED for further proceedings consistent with
this opinion.

   **SO ORDERED.**

                                   /s/ William G. Young
                                    WILLIAM G. YOUNG
                                    DISTRICT JUDGE